**Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.**



ATTORNEY FOR APPELLANT:

**KENNETH I. SONDIK**
Fishers, Indiana

ATTORNEYS FOR APPELLEE:

**GREGORY F. ZOELLER**
Attorney General of Indiana

**JAMES B. MARTIN**
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

| | | |
|---|---|---|
| MICHAEL EATON, | ) | |
| | ) | |
| Appellant-Defendant, | ) | |
| | ) | |
| vs. | ) | No. 29A02-1308-CR-699 |
| | ) | |
| STATE OF INDIANA, | ) | |
| | ) | |
| Appellee-Plaintiff. | ) | |

APPEAL FROM THE HAMILTON SUPERIOR COURT
The Honorable William J. Hughes, Judge
Cause No. 29D03-1205-FC-4393

**January 29, 2014**

**MEMORANDUM DECISION - NOT FOR PUBLICATION**

**BARTEAU, Senior Judge**

Michael Eaton challenges the sufficiency of the evidence supporting his conviction for Class C felony battery resulting in serious bodily injury. We affirm.[1]

ISSUES

Eaton contends the evidence is insufficient to: (1) identify him as the assailant and (2) establish that the victim suffered serious bodily injury.

FACTS AND PROCEDURAL HISTORY

On the night of May 5, 2012, Scott Hensler was celebrating Cinco de Mayo at several bars in Noblesville. Around 2:30 a.m. the next morning, Hensler left the Silver Dollar bar and started walking down the sidewalk. As he passed a group of three men, his shoulder grazed the shoulder of one of them. He said, "Excuse me," and one of the men said, "What?" Tr. p. 163. Hensler explained he was apologizing for running into one of them.

Hensler remembered that all three men were "pretty tall." *Id.* One of them was "much taller than the other[s]. Pretty big, I guess." *Id.* The man Hensler bumped into was the tallest one, although Hensler was not sure about his weight. *Id.* The last thing Hensler remembered of the incident was that one of the men "said something smart-al[e]ck" to him. *Id.* The next thing he could remember was waking up in the hospital.

Jonathon Swinford and Mike Sowers each witnessed Hensler getting punched by one of the men. Swinford had just parked his car up the street and was on his way to the

---

[1] Eaton has filed a Motion for Oral Argument. We deny this motion by separate order issued contemporaneously with this opinion.

Silver Dollar when he saw Hensler walking out of the bar. From about forty yards away, Swinford saw three men get out of a vehicle and walk toward Hensler. Two of the men were "about my size, [and] the other one was noticeably bigger." *Id.* at 130. Because it was dark outside and there was only dim lighting, he could not identify their race and saw "more body shapes than anything." *Id.* at 141. Swinford saw "the bigger gentleman" punch Hensler in the face, which "knocked him backwards." *Id.* at 131, 130. One of the men then reached down and appeared to try to take something from him, but Swinford did not see if anything was actually taken. The men returned to their vehicle and left. Swinford called 911 and described the vehicle as a green Jeep Cherokee.

Sowers was drinking at the Silver Dollar and walked out of the bar to get some cigarettes from his truck. Near the door, he saw "three guys and one girl standing on the edge of the road." *Id.* at 149. Sowers joked, "What are you all doing, getting in a fight?" *Id.* They looked at him, and then "one of them sucker-punched" Hensler. *Id.* Sowers affirmed that it was the tallest man who threw the punch. *Id.* at 158. He also described the aggressor as "real slender." *Id.* at 156. Sowers saw Hensler fall and heard his head hit the pavement. The single punch had "[k]nocked him out cold." *Id.* The aggressor and the others fled in a 1990s blue or black Jeep Cherokee. Because Hensler had fallen into the road, Sowers "grabbed his arm and pulled him back onto the sidewalk so he wouldn't get hit." *Id.* at 149. Sowers went to his truck to get his cigarettes and to check on his dog, and when he returned, the police were already there.

Officer Gerald Fenimore of the Noblesville Police Department was dispatched to the Silver Dollar bar on a report of a possible robbery. He arrived "a few moments" after

3

the dispatch and saw Hensler lying on the curb outside the bar. *Id.* at 177. Hensler was conscious but unresponsive. Officer Fenimore spoke with Sowers, who told him that he had pulled Hensler out of the street after he was punched and that the subjects fled in a black Jeep. Officer Fenimore gave dispatch a description of the vehicle and then accompanied Hensler to the hospital. There, Hensler was speaking but "wasn't being coherent or recalling anything." *Id.* at 180. He did not remember being at the Silver Dollar and did not know why he was at the hospital.

Officer Bradley Kline was just north of the Silver Dollar when a dispatch advised him of a battery and a dark SUV leaving the scene. As he drove around the area looking for a dark SUV, he received a dispatch updating the description of the vehicle as a black Jeep Grand Cherokee. He spotted a black Jeep Grand Cherokee, followed it, and initiated a traffic stop after it rolled through a stop sign. The police drove Sowers to the location of the stop, where he confirmed the vehicle was the same one he saw leaving the scene. Two women and three men were in the vehicle. The men were identified as Eaton, Scott Earlywine, and Jeremy Whetsel.

All five of the vehicle's occupants were transported to the police department and interviewed by Detective Timothy Hendricks and another detective. Detective Hendricks described Whetsel as "[a]pproximately five-six to five-ten, 125 to 150 pounds," Earlywine as "[f]ive-eight to six foot, 150 to 175," and Eaton as "[s]ix-foot-two to six-foot-six, 325 to 375 maybe." *Id.* at 199. All five individuals were released because the detectives were unable to determine who had committed the battery.

On May 7, 2012, Detective Hendricks showed Swinford three sets of photo arrays. Swinford identified Eaton, Earlywine, and Whetsel as the three men who approached Hensler. He specifically pointed out Eaton as the man who threw the punch. Swinford knew all three men from high school but had only seen Eaton "[m]aybe twice" and Earlywine and Whetsel "a handful of times" since 1998 or 1999. *Id.* at 133, 144.

At the hospital, Hensler underwent CAT scans of his head and neck. Dr. Michael Skulski, a radiologist, determined from the head scan that Hensler suffered a subarachnoid hemorrhage, which he explained as a collection of blood around the brain, brain stem, or cervical spine; a cephalhematoma, which he explained as a bruise or a blood collection in the scalp; and a left maxillary fracture. He noted the fracture may have included the left orbital floor. He explained that the maxillary bone was the cheekbone and the orbital floor was the area around the eye socket. From the neck scan, Dr. Skulski noted "some mild reversal of the normal curvature of the cervical spine which can be due to spasm or can be due to patient pain and the way they're positioned." *Id.* at 214. Because the head scan revealed bleeding around Hensler's brain, he was transported to St. Vincent Hospital on 86th Street in Indianapolis in the event that he would need surgery.

Hensler remained in the hospital for two days. He described his stay as "pretty hazy the whole time" and his pain level as "[s]even, eight" on a ten-point scale. *Id.* at 164. He explained his injuries as a fracture under his eye, a fracture on his jaw, and bleeding on the brain. He had no memory of talking with any police officers at the hospital or being transferred to St. Vincent. When he was discharged, he was instructed

5

to take hydrocodone for pain. He took the medication for a few days but then stopped because he does not like pain medication. Three or four days later, his pain had subsided to a "three or four," and he was "[j]ust kind of achy." *Id.* at 166. For about a week and a half, he was "really dysfunctional, kind of hazy and real dizzy." *Id.* He returned to work because he had bills to pay, but he was "mainly doing light duty kind of stuff" because the pain interfered with his ability to do his job. *Id.*

The State charged Eaton with Class C felony battery resulting in serious bodily injury and Class B misdemeanor disorderly conduct. A jury found him guilty of both counts. Before his sentencing hearing, Eaton filed a motion for judgment on the evidence. The trial court denied the motion, entered judgment of conviction only on the Class C felony due to double jeopardy concerns, and sentenced him to two years on home detention under electronic monitoring. Eaton now appeals his conviction.

## DISCUSSION AND DECISION

Eaton contends the evidence is insufficient to sustain his conviction. In reviewing a sufficiency of the evidence claim, we neither reweigh the evidence nor assess the credibility of witnesses. *Bailey v. State*, 979 N.E.2d 133, 135 (Ind. 2012). Rather, we look to the evidence and reasonable inferences drawn therefrom that support the verdict. *Id.* We affirm if there is probative evidence from which a reasonable jury could have found the defendant guilty beyond a reasonable doubt. *Id.*

To convict Eaton of battery as a Class C felony, the State had to prove beyond a reasonable doubt that he knowingly or intentionally touched Hensler in a rude, insolent, or angry manner resulting in serious bodily injury to Hensler. *See* Ind. Code § 35-42-2-

6

1(a)(3) (2009). Eaton argues the evidence is insufficient to: (1) identify him as the assailant and (2) establish that Hensler suffered serious bodily injury.

## I. IDENTIFICATION OF EATON AS ASSAILANT

The following evidence presented at trial easily shows that the individuals involved in the incident with Hensler were Eaton, Earlywine, and Whetsel. Hensler identified the people he passed as three "pretty tall" men, with one of them being "much taller" than the others and "[p]retty big." Tr. p. 163. Swinford, who was about forty yards away, saw three men approach Hensler, with one of them being "noticeably bigger" than the others. *Id.* at 130. After the battery, the three men fled in what Swinford described as a green Jeep Cherokee. Sowers, who was mere feet from the incident, saw two "guys and one girl" standing with Hensler. *Id.* at 149. After the battery, the three individuals fled in what Sowers described as a 1990s blue or black Jeep Cherokee. The police stopped a black Jeep Grand Cherokee, which Sowers confirmed as the vehicle leaving the scene. Its occupants were two women and three men, and the men were identified as Eaton, Earlywine, and Whetsel. Detective Hendricks described Whetsel as "[a]pproximately five-six to five-ten, 125 to 150 pounds," Earlywine as "[f]ive-eight to six foot, 150 to 175," and Eaton as "[s]ix-foot-two to six-foot-six, 325 to 375 maybe." *Id.* at 199.

The following evidence additionally establishes that Eaton was the person who punched Hensler. Swinford saw "the bigger gentleman" punch Hensler. *Id.* at 131. When he later met with the police, Swinford picked out Eaton, Earlywine, and Whetsel from three separate photo arrays as being the men who approached Hensler. He

7

specifically identified Eaton as the man who threw the punch. Swinford's testimony was corroborated by Sowers and Hensler. Sowers testified that it was the tallest man who punched Hensler. Hensler did not see who punched him; however, he testified that the man he bumped into was the tallest one, "much taller" than the others, and "[p]retty big." *Id.* at 163.

Eaton nonetheless claims that the testimony of Swinford, the only person who specifically identified him as the perpetrator, is incredibly dubious and that it is more likely that Earlywine or Whetsel punched Hensler. Appellate courts may apply the incredible dubiosity rule to impinge upon the jury's function to judge witness credibility. *Fajardo v. State*, 859 N.E.2d 1201, 1208 (Ind. 2007), *superseded by statute on other grounds*. Under this rule, a defendant's conviction may be reversed if: (1) a sole witness presents inherently improbable testimony or coerced, equivocal, wholly uncorroborated testimony of incredible dubiosity and (2) there is a complete lack of circumstantial evidence. *Id.* "Application of this rule is rare and the standard to be applied is whether the testimony is so incredibly dubious or inherently improbable that no reasonable person could believe it." *Id.*

Eaton argues Swinford's testimony identifying him as the assailant from a photo array is incredibly dubious because his other testimony showed he really only saw body shapes in the dim lighting and did not recognize the men that night even though he knew them from high school. Further characterizing Swinford's identification of him as both "fantastical" and "bogus," Appellant's Reply Br. p. 5, he points to the following testimony:

8

Q    So when you recognized the photos to be people that you knew, did you also recognize them to be the gentlemen on May 6th?

A    As far as facial recognition, I wouldn't know that it was him as far as May the 6th. Like if, like if someone had come to me and said was it Michael Eaton, I wouldn't be able to say yes.

Q    Did you identify him from the photo array, however?

A    Yes.

Q    And at that time did you realize that that is who was involved on May 6th?

A    I believe so, yes.

Tr. p. 133. Eaton claims it is "preposterous" that Swinford chose his photo, which was a frontal face shot, when he did not recognize any faces that night. Appellant's Reply Br. p. 4.

We find nothing inherently improbable about Swinford's testimony. A jury could reasonably believe that, at the time of the crime, Swinford could not identify three body shapes in the dead of night as Eaton, Earlywine, and Whetsel, individuals he had seen only a few times since 1999. That same jury could also reasonably believe that Swinford only realized that it was Eaton, Earlywine, and Whetsel and that Eaton was the person who threw the punch when he was later faced with the photo arrays.

Moreover, there is not a complete lack of circumstantial evidence, nor was Swinford the sole witness providing wholly uncorroborated testimony. Hensler testified he bumped into the tallest man shortly before he was punched. Sowers testified it was the tallest man who punched Hensler. Swinford and Sowers both identified the getaway vehicle as a dark Jeep Cherokee. When a vehicle matching that description was pulled over, Eaton, Earlywine, and Whetsel were inside. The record is clear that Eaton was the tallest of the group. Additionally, Swinford identified not only Eaton as the assailant but

9

also Earlywine and Whetsel as his companions, the very people the police pulled out of the vehicle and interviewed at the police department.

Despite this clear evidence, Eaton points out that although Swinford testified it appeared that one of the men tried to take something from Hensler, Sowers did not indicate whether this occurred and Officer Fenimore testified Hensler still had his wallet and money when he found him. The testimony on this point is not inconsistent. Swinford said it "looked like" one of the men tried to take something, but he "didn't see anything in the person's hand." Tr. p. 131.

Eaton also notes that although Swinford testified that one of the men was "noticeably bigger" and that "the bigger gentleman" was the assailant, *id.* at 130-31, Sowers, who was closer to the altercation, testified several times that the assailant was very slender and skinny. We acknowledge the inconsistency, but "[i]nconsistencies in identification testimony go to the weight of that testimony; it is the jury's task to determine the credibility of the various witnesses and of the evidence presented." *Lee v. State*, 735 N.E.2d 1112, 1115 (Ind. 2000).

Eaton further notes that the incredible dubiosity rule was applied to reverse a conviction in *Sisson v. State*, 710 N.E.2d 203 (Ind. Ct. App. 1999), *trans. denied*, and that the instant case "presents an even more deserving situation for [its] application." Appellant's Br. p. 21. *Sisson*, however, is clearly distinguishable. In that case, Sisson was convicted of burglary based on Bell's testimony. Bell's testimony, though, was inherently contradictory and equivocal. He first testified that Sisson was with him for three different burglaries and entered each of the homes. However, he then testified that

10

Sisson was with him for only one of the burglaries (which was not even the burglary for which Sisson was convicted) and that he had lied so they would receive the same sentence. Bell's testimony at some point also indicated that Sisson had not entered any of the homes. Bell's testimony was also "riddled with equivocal language." *Id.* at 206. This Court therefore found Bell's testimony incredibly dubious and reversed Sisson's conviction. *Id.* at 208.

In contrast, Swinford's testimony was neither contradictory nor equivocal. He testified that he saw the biggest man punch Hensler, and although he did not recognize Eaton that night, he realized the assailant was Eaton once the police showed him the photo arrays. His testimony never wavered that it was the biggest man who threw the punch. In addition, as noted above, Swinford was not the sole witness, nor was there a complete lack of circumstantial evidence.

We thus decline to invoke the incredible dubiosity rule to impinge upon the jury's evaluation of the evidence. The evidence is sufficient to identify Eaton as the assailant.

## II. SERIOUS BODILY INJURY

Eaton also argues the evidence is insufficient to establish that Hensler suffered serious bodily injury. Serious bodily injury is defined as

> bodily injury that creates a substantial risk of death or that causes:
> (1) serious permanent disfigurement;
> (2) unconsciousness;
> (3) extreme pain;
> (4) permanent or protracted loss or impairment of the function of a bodily member or organ; or
> (5) loss of a fetus.

11

Ind. Code § 35-41-1-25 (1997).[2] The charging information does not specify any of these categories but alleges the serious bodily injury to be a "broken cheek bone or broken orbital bone or bleeding on the brain." Appellant's App. p. 9.

When determining whether a bodily injury is "serious," we exercise considerable deference to the fact-finder. *See Davis v. State*, 813 N.E.2d 1176, 1178 (Ind. 2004); *Whitlow v. State*, 901 N.E.2d 659, 661 (Ind. Ct. App. 2009) ("Whether bodily injury is 'serious' is a question of degree and, therefore, appropriately reserved for the finder of fact."). Nevertheless, such deference is not absolute. *See Davis*, 813 N.E.2d at 1178 (holding that evidence of slightly lacerated lip, abrasion to knee, and broken pinky finger did not establish serious bodily injury). There is no bright line rule differentiating "bodily injury" from "serious bodily injury." *See id.*

Dr. Skulski testified that Hensler suffered a subarachnoid hemorrhage, a cephalhematoma, and a left maxillary fracture, which may have included the left orbital floor. He further provided explanations of these conditions from which the jury could easily determine that Hensler had bleeding around his brain and a broken left cheekbone, which may have included a fracture to the area around his left eye socket. For his part, Hensler testified that he had a fracture under his eye and bleeding on his brain. As a result of his injuries, Hensler suffered pain at a level of seven or eight on a ten-point scale, was ordered to take hydrocodone for pain, and was dysfunctional, hazy, and dizzy for about a week and a half. Sowers testified that he heard Hensler's head hit the pavement and that the single punch had "[k]nocked him out cold." Tr. p. 156. A

---

[2] This statute has since been recodified at Indiana Code section 35-31.5-2-292 (2012).

reasonable jury could conclude from this evidence that Hensler suffered a broken cheekbone and bleeding on the brain and that these injuries caused extreme pain and protracted impairment of the functioning of his brain. *See Whitlow*, 901 N.E.2d at 661-62 (serious bodily injury established where defendant repeatedly struck victim with belt, leaving marks on victim's body and causing pain victim described as never having felt anything close to the way the bruises made her feel). The evidence is thus sufficient to establish that Hensler suffered serious bodily injury.

## CONCLUSION

We therefore affirm Eaton's conviction.

RILEY, J., and BRADFORD, J., concur.